UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| STEPHEN M. MADIGAN, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:11-cv-00094-JAW |
| | ) | |
| WEBBER HOSPITAL ASSOC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

In this employment dispute, a radiologist lost his job when the hospital where he worked decided to engage a new medical group to provide its radiology services. The radiologist claims that when he applied for a position with the new group, both the hospital and the new provider discriminated against him on the basis of his age, and that the hospital tortiously interfered with his prospective contractual advantage with the new provider. The new provider moves for summary judgment on the age discrimination claim, and the hospital moves for summary judgment on the tortious interference claim. Concluding that there are genuine issues of material fact that preclude summary judgment, the Court denies the motions.

I.    **STATEMENT OF FACTS**

A.    **Procedural History**

On March 17, 2011, Stephen M. Madigan, M.D., filed a complaint in this Court against The Webber Hospital Assoc. d/b/a Southern Maine Medical Center (SMMC) and Spectrum Medical Group, P.A. (Spectrum). *Compl.* (ECF No. 1). On

April 4, 2011, Dr. Madigan amended his complaint. *Am. Compl.* (ECF No. 5). Dr. Madigan's Amended Complaint alleges, in Count I, that SMMC and Spectrum jointly and intentionally engaged in age discrimination in violation of the Maine Human Rights Act (MHRA) and the Age Discrimination in Employment Act (ADEA), and, in Count II, that SMMC tortiously interfered with Dr. Madigan's prospective contractual advantage with Spectrum. On May 16, 2011, Spectrum answered the Amended Complaint. *Def. Spectrum's Answer and Defenses to Pl.'s Am. Compl.* (ECF No. 8). On May 20, 2011, SMMC answered the Amended Complaint. *Def. SMMC's Answer and Defenses to the Am. Compl.* (ECF No. 10).

On February 17, 2012, SMMC filed a motion for summary judgment on Count II and an accompanying statement of material facts. *SMMC's Mot. for Summ. J. on Pl.'s Tortious Interference Claim* (ECF No. 37) (*SMMC's Mot.*); *SMMC's Statement of Material Facts* (ECF No. 38) (DSMF2). Also on February 17, 2012, Spectrum filed a motion for summary judgment on Count I and an accompanying statement of material facts. *Def. Spectrum's Mot. for Summ. J.* (*Spectrum's Mot.*) (ECF No. 39); *Def. Spectrum's Statement of Material Facts in Support of Mot. for Summ. J.* (ECF No. 40) (DSMF1).

On April 27, 2012, Dr. Madigan responded to SMMC's motion and statement of material facts, and included a statement of additional material facts. *Pl.'s Opp'n to SMMC's Mot. for Summ. J. on Pl.'s Tortious Interference Claim* (ECF No. 57) (*Pl.'s Opp'n 2*); *Pl.'s Resp. to SMMC's Statement of Material Facts* (PRDSMF2) *and Statement of Additional Facts* (PSAMF2) (ECF No. 58). On April 30, 2012, Dr.

2

Madigan responded to Spectrum's motion and statement of material facts, and included a statement of additional material facts. *Pl.'s Opp'n to Spectrum's Mot. for Summ. J.* (ECF No. 61) (*Pl.'s Opp'n 1*); *Pl.'s Resp. to Spectrum's Statement of Material Facts* (PRDSMF1) *and Statement of Additional Facts* (PSAMF1) (ECF No. 62).

On May 18, 2012, SMMC replied to Dr. Madigan's response and statement of additional material facts. *SMMC's Reply Mem. in Supp. of Mot. for Summ. J. on Pl.'s Tortious Interference Claim* (ECF No. 69) (*SMMC's Reply*); *SMMC's Reply to Statement of Additional Material Facts* (ECF No. 68) (DRPSAMF2). On July 12, 2012, Spectrum replied to Dr. Madigan's response and statement of additional material facts. *Reply to Pl.'s Opp'n to Def. Spectrum's Mot. for Summ. J.* (ECF No. 79) (*Spectrum's Reply*); *Def. Spectrum's Reply to Pl.'s Statement of Additional Material Fact and Def. Spectrum's Resp. to Pl.'s Objections to Def.'s Statement of Material Fact* (ECF No. 80) (DRPSAMF1).

On August 1, 2012, Dr. Madigan responded to Spectrum's evidentiary objections. *Pl.'s Local Rule 56(e) Resp. to Def. Spectrum's Evidentiary Objections* (ECF No. 83) (*Pl.'s Evid. Resp. 1*).

**B.    Factual Background**

**1.    The Summary Judgment Praxis**

In accordance with "the conventional summary judgment praxis," the Court recounts the facts in the light most hospitable to Dr. Madigan's case theories, consistent with record support. *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11,

3

17 (1st Cir. 2002).  In compliance with this obligation, the Court recites supported facts as true even if disputed by SMMC or Spectrum.

### 2.    Relevant Background

Stephen M. Madigan, M.D. is a radiologist.  DSMF2 ¶ 1; PRDSMF2 ¶ 1.  Dr. Madigan first joined a group of radiologists practicing at SMMC on July 22, 1985. DSMF2 ¶ 2; PRDSMF2 ¶ 2.  As the senior radiologists in the group retired, Dr. Madigan and Dr. Thomas Tupper formed Southern Maine Imaging Associates (SMIA) in 1994.  DSMF2 ¶ 3; PRDSMF2 ¶ 3.  Two other radiologists later joined SMIA: Dr. Michael Merriam in 1997 and Dr. Gregory Weltin in 2001. DSMF2 ¶ 4; PRDSMF2 ¶ 4.  Drs. Madigan, Tupper, Merriam and Weltin were equal shareholders in and employed by SMIA.  DSMF2 ¶ 5; PRDSMF2 ¶ 5.

SMIA provided radiology services to SMMC pursuant to a contract between SMIA and SMMC from 1994 through April 30, 2010.  DSMF2 ¶ 6; PRDSMF2 ¶ 6. The contract was "evergreen," meaning that it would be automatically renewed unless notice of non-renewal was provided to SMIA.  DSMF2 ¶ 7; PRDSMF2 ¶ 7.

Spectrum is a physician-owned and physician-directed professional organization that provides specialty medical services in many fields.  DSMF1 ¶ 1; PRDSMF1 ¶ 1.  Spectrum provides its services to more than forty hospitals, medical centers, and health care facilities in Maine and New Hampshire.  DSMF1 ¶ 1; PRDSMF1 ¶ 1.  Spectrum is comprised of several divisions, separated by specialty and geographic region.  DSMF1 ¶ 2; PRDSMF1 ¶ 2.  These divisions include

Anesthesiology North, Anesthesiology South, Pathology, Radiation Oncology, Radiology North, and Radiology South.  DSMF1 ¶ 2; PRDSMF1 ¶ 2.

Spectrum and SMMC are separate legal entities; they are not commonly owned, and do not have common management or centralized labor relations. DSMF1 ¶ 25; PRDSMF1 ¶ 25.  Spectrum has no control over SMMC's operations, employees, policies, or labor relations.[1]  DSMF1 ¶ 25; PRDSMF1 ¶ 25.

During the time period relevant to this action, David Landry was Spectrum's Chief Executive Officer (CEO); Jeff Cutler was Spectrum's Director of Human Resources; Brad Clark was Spectrum's Director of Operations; Michael Quinn, M.D., was the Managing Director of Spectrum's Radiology South Division; Ed McGeachey was SMMC's President and CEO; Frank Lavoie, M.D., was SMMC's Executive Vice-President and Chief Operating Officer; and Steve Keegan was SMMC's Vice-President of Clinical Services.  DSMF1 ¶ 3; PRDSMF1 ¶ 3.

### 3.   SMMC Decides to Change Radiology Service Providers

In June 2009, SMMC's Chief Operating Officer, Frank Lavoie, M.D., met with Dr. Madigan, ostensibly over the issue of nighttime coverage.[2]  PSAMF1 ¶ 37;

---

[1]      The Plaintiff denied that SMMC has no control over the radiologists who worked at its hospital, supporting its denial with a barrage of factual assertions.  PRDSMF1 ¶ 25.  Though some of these assertions are unsupported by citations to the record, many are based on an Agreement between SMMC and Spectrum dated May 1, 2010.  See DSMF1 Attach. 6, Agreement.  Based on a review of this Agreement, and in compliance with its obligation to view the facts in the light most favorable to the Plaintiff, the Court has excluded Spectrum's statement that SMMC has no control over Spectrum's operations, employees, policies, or labor relations.

[2]      Spectrum objected to and interposed a qualified response to PSAMF1 ¶ 37, which contains five sentences and is supported by Dr. Madigan's sworn Charge to the Maine Human Rights Commission and Equal Employment Opportunity Commission.  Spectrum's response contains at least five separate arguments.  DRPSAMF1 ¶ 37.  The first two—that no one from Spectrum was involved in the alleged conversations between Dr. Lavoie and Dr. Madigan and that these conversations were never communicated to Spectrum before it received the Charge of Discrimination—the Court disregards as non-responsive.  Spectrum's third argument—that Dr.

DRPSAMF1 ¶ 37.   During this conversation, Dr. Lavoie raised the issue of switching radiology services to Spectrum.  PSAMF1 ¶ 37; DRPSAMF1 ¶ 37.  Dr. Lavoie said three times: "You're old and your group is getting older."  PSAMF1 ¶ 37; DRPSAMF1 ¶ 37.   Dr. Lavoie also indicated that he was "concerned about [Dr. Madigan's] ability to provide radiology services for the hospital over the next five years."  PSAMF1 ¶ 37; DRPSAMF1 ¶ 37.  As Dr. Madigan is paralyzed from the waist down, he suspected this reflected a feeling that someone who was paralyzed had more problems with age.[3]

On October 16, 2009, SMMC through Dr. Frank Lavoie, SMMC's Executive Vice President and Chief Operating Officer, notified Dr. Madigan and SMIA that SMMC would not automatically renew its professional services agreement with

---

Lavoie denies making the alleged age-related comments—fails because the Court is obligated to view the facts in the light most favorable to the non-movant, Dr. Madigan.  Spectrum's fourth argument targets only the last sentence of PSAMF1 ¶ 37, and will be discussed in turn.

Spectrum's fifth argument is that the Charge of Discrimination cited as support for PSAMF1 ¶ 37 does not meet the requirements of FED. R. CIV. P. 56(e) because it is not based on personal knowledge and does not set out facts that would be admissible in evidence.  The relevant provision is now found in Rule 56(c)(4): "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  FED. R. CIV. P. 56(c)(4).  The Court overrules this objection as to the first four sentences because the record citation indicates that they are based on Dr. Madigan's personal knowledge of his June 2009 meeting with Dr. Lavoie.  *See* PSAMF1 Attach. 3, *Affidavit Dr. Madigan's MHRC Charge*, 2.

[3]   Spectrum objected to this sentence on the ground that it is "Dr. Madigan's subjective belief and is not a statement of material fact."  DRPSAMF1 ¶ 37.  Spectrum's general objection to PSAMF1 ¶ 37 under Rule 56(c)(4) based on lack of personal knowledge is also relevant here.  Dr. Madigan responds that this sentence "is permissible lay opinion under FED. R. EVID. 701 as it is rationally based upon Dr. Madigan's perceptions and helpful to the determination of a fact in issue."  *Pl.'s Evid. Resp. 1* at ¶ 37.  Dr. Madigan also argues that his paralysis is within his personal knowledge and that a fact-finder "can draw the inference that Dr. Lavoie might believe that those who are paralyzed age less well than those who are able-bodied."  *Id.*

This is a close call.  Dr. Madigan's subjective beliefs might be admissible for some purposes but here his subjective belief is transferred as the subjective belief of Dr. Lavoie.  In the context of a motion for summary judgment, where the evidence is presented in a static form, the Court has included Dr. Madigan's statement because it is phrased as Dr. Madigan's opinion and there is no opportunity to further explore the foundational basis for his opinion.  This does not, however, predict the admissibility of the statement at trial.

SMIA on the expiration of the current contract year ending April 30, 2010, but would go out to bid.  DSMF2 ¶ 8; PRDSMF2 ¶ 8.

On November 2, 2009, Dr. Lavoie, SMMC's Executive Vice-President and Chief Operating Officer, called Mr. Landry, Spectrum's CEO, to tell him that SMMC had decided not to renew its contract with SMIA for diagnostic imaging services at SMMC and would be sending out a Request for Proposal (RFP) for those services.  DSMF1 ¶ 4; PRDSMF1 ¶ 4.  Dr. Lavoie asked Mr. Landry if Spectrum would be interested in submitting a proposal in response to the RFP.  DSMF1 ¶ 4; PRDSMF1 ¶ 4; DSMF2 ¶ 9; PRDSMF2 ¶ 9.  Mr. Landry stated that Spectrum would be interested in submitting a proposal.  DSMF1 ¶ 4; PRDSMF1 ¶ 4; DSMF2 ¶ 10; PRDSMF2 ¶ 10.

During their conversation, Mr. Landry asked Dr. Lavoie why SMMC had decided to send out the RFP instead of continuing its existing diagnostic imaging services.  Dr. Lavoie explained that (i) SMIA (a) had not kept up with the medical imaging demands of the medical staff and current radiology, (b) did not function well as a group and had not shown any leadership in the Radiology Department at SMMC, and (c) were focused on their own productivity to the detriment of the Radiology Department and service to the medical staff, and (ii) there were increasing complaints from the medical staff at SMMC regarding SMIA, including (a) their lack of cohesiveness, cooperation, and availability, (b) their reluctance to adjust their work flow to meet the needs of the hospital and its medical staff, and (c)

the quality of their reports.[4]   DSMF1 ¶ 5; PRDSMF1 ¶ 5.   As a result, SMMC decided that it needed to consider alternative providers.   DSMF1 ¶ 5; PRDSMF1 ¶ 5.

During the same conversation, Dr. Lavoie indicated that Dr. Madigan was a managing partner of SMIA and that he was difficult to work with and had provided no direction for his group or the Radiology Department at SMMC.   PSAMF1 ¶ 38; DRPSAMF1 ¶ 38; PSAMF2 ¶ 30; DRPSAMF2 ¶ 30.   Dr. Lavoie also stated that if Spectrum was selected to provide diagnostic imaging services at SMMC, Drs. Weltin, Merriam, and Tupper would be welcome to continue to practice at SMMC, but that, given their difficulties with Dr. Madigan, SMMC wanted to see new leadership in the Radiology Department.   PSAMF1 ¶ 39; DRPSAMF1 ¶ 39; PSAMF2 ¶ 31; DRPSAMF2 ¶ 31.   Dr. Lavoie also said, "Tupper, Merriam, and Weltin are all good doctors and good people, but they do not play well it looks like together show little cooperation and teamwork and there is no one running the show.   Madigan is – is a whole other story."   PSAMF1 ¶ 40; DRPSAMF1 ¶ 40; PSAMF2 ¶ 32; DRPSAMF2 ¶ 32.   Dr. Lavoie indicated that if Spectrum were successful, Dr. Lavoie would be open to Spectrum's "retaining the three aforementioned rads and putting in new leadership of the department."   PSAMF1 ¶ 40; DRPSAMF1 ¶ 40; PSAMF2 ¶ 32; DRPSAMF2 ¶ 32.   Dr. Lavoie also indicated

---

[4]      Dr. Madigan interposed a qualified response, arguing that "[t]his is far more than Mr. Landry remembered about this conversation" in other testimony.  PRDSMF1 ¶ 5.  Dr. Madigan's accompanying citation to Mr. Landry's deposition, however, refers to pages from the deposition transcript not in the record.  Dr. Madigan also notes that a service called Avatar had given SMIA's Radiology Department a high rating, *see id.*, but this argument is non-responsive, since DSMF1 ¶ 5 relates the conversation between Mr. Landry and Dr. Lavoie, and does not assert an objective assessment of the quality of SMIA's Radiology Department.

that SMMC would have no objection to Dr. Madigan's being hired by Spectrum to work at another location.[5]  DSMF2 ¶ 11; PRDSMF2 ¶ 11.  Shortly after the November 2, 2009 conversation, Mr. Landry sent an email to Michael Quinn, M.D., Managing Director of Spectrum's Radiology South Division, telling Dr. Quinn about his conversation with Dr. Lavoie.  DSMF1 ¶ 7; PRDSMF1 ¶ 7.

### 4.  SMMC Selects Spectrum to Provide Diagnostic Imaging Services

The RFP was issued on November 10, 2009.  DSMF2 ¶ 12; PRDSMF2 ¶ 12.  On or about November 24, 2009, Spectrum received the RFP.  DSMF1 ¶ 8; PRDSMF1 ¶ 8.  SMIA and Spectrum submitted bids in response to the RFP; Spectrum's submission occurred on December 30, 2009.  DSMF2 ¶ 13; PRDSMF2 ¶ 13; DSMF1 ¶ 8; PRDSMF1 ¶ 8.  On February 2, 2010, Spectrum presented its proposal for services to SMMC's administration and medical staff.[6]  DSMF1 ¶ 8; PRDSMF1 ¶ 8.  Between November 2, 2009, and February 5, 2010, there were no discussions between SMMC and Spectrum concerning any limitations on Dr. Madigan's opportunities for employment with Spectrum.  DSMF2 ¶ 16; PRDSMF2 ¶ 16.

---

[5]  Dr. Madigan denied DSMF2 ¶ 11 generally, which includes this statement.  SMMC supported this statement citing Dr. Lavoie's deposition.  DSMF2 ¶ 11.  In his denial, Dr. Madigan argues that earlier statements by Mr. Landry regarding this conversation did not include this part of the conversation.  The Court has included the statement because Dr. Madigan's argument is more a qualification than a denial, and does not contradict Dr. Lavoie's testimony.

[6]  Dr. Madigan denied DSMF2 ¶¶ 14 and 19, which state that Spectrum's ability to compete for or obtain the contract for radiology services at SMMC was not contingent on any agreement by Spectrum not [to] hire Dr. Madigan.  DSMF2 ¶ 14; PRDSMF2 ¶ 14; DSMF2 ¶ 19; PRDSMF2 ¶ 19.  In compliance with its obligation to view the facts in the light most favorable to Dr. Madigan, the Court has not included DSMF2 ¶¶ 14 and 19 in its recitation of the facts.

On February 5, 2010, Mr. Landry met with Ed McGeachey, Dr. Lavoie, and Steve Keegan, and was informed that Spectrum had been chosen to provide radiology services at SMMC.  PSAMF1 ¶ 41; DRPSAMF1 ¶ 41; PSAMF2 ¶ 33; DRPSAMF2 ¶ 33; DSMF1 ¶ 9; PRDSMF1 ¶ 9; DSMF2 ¶ 15; PRDSMF2 ¶ 15. Spectrum's contract with SMMC for radiology services would be effective as of May 1, 2010.  DSMF2 ¶ 17; PRDSMF2 ¶ 17.

The February 5, 2010, meeting also included a discussion of the radiologists from SMIA.  DSMF1 ¶ 9; PRDSMF1 ¶ 9.  In particular, Mr. Landry was informed that Dr. Madigan was "difficult to work with, uncooperative, inflexible, and argumentative."  PSAMF1 ¶ 41; DRPSAMF1 ¶ 41; PSAMF2 ¶ 33; DRPSAMF2 ¶ 33. Mr. Landry was also informed that, "because Dr. Madigan failed to provide leadership to his group and the Radiology Department[,] he was viewed as the primary reason for SMMC's dissatisfaction with SMI and the resulting change in service."  PSAMF1 ¶ 41; DRPSAMF1 ¶ 41; PSAMF2 ¶ 33; DRPSAMF2 ¶ 33. Nevertheless, SMMC encouraged Spectrum to consider Dr. Madigan for positions at other hospitals or health care facilities.  DSMF1 ¶ 10; PRDSMF1 ¶ 10.

On February 10, 2010, Mr. McGeachey and Dr. Lavoie met with the SMIA physicians, including Dr. Madigan, to advise them that Spectrum would be awarded the contract with SMMC for radiology services.  DSMF2 ¶ 21; PRDSMF2 ¶ 21.

**5.    Spectrum Hires Radiologists to Provide Services at SMMC**

Spectrum did not consider the employment of any of the SMIA physicians, and did not make the decision not to hire Dr. Madigan, until after it had been awarded the contract.  DSMF2 ¶ 20; PRDSMF2 ¶ 20.  Dr. Madigan and the three

other SMIA radiologists met with Spectrum personnel for an informational meeting on March 4, 2010.  DSMF2 ¶ 22; PRDSMF2 ¶ 22.  During that meeting, Spectrum presented its business model to the doctors and explained how it intended to provide diagnostic imaging services at SMMC.  DSMF1 ¶ 11; PRDSMF1 ¶ 11.

On March 5, 2010, Dr. Madigan called Spectrum and asked Mr. Cutler how much Spectrum would pay him, and for a copy of the employment agreement.[7] DSMF1 ¶ 12; PRDSMF1 ¶ 12.  Mr. Cutler told Dr. Madigan that Spectrum had not made any hiring decisions and that there was a selection process that needed to be followed before Spectrum could make any hiring decisions.  DSMF1 ¶ 12; PRDSMF1 ¶ 12.  Mr. Cutler, during his interactions with Dr. Madigan, stated that he was the person with whom Dr. Madigan would negotiate any contracts, and made it clear that he had authority to negotiate contracts; he left it uncertain as to who would have signing authority on behalf of Spectrum.[8]  PSAMF1 ¶ 59; DRPSAMF1 ¶ 59.

Mr. Cutler invited Dr. Madigan to meet with him to discuss potential employment opportunities with Spectrum.  DSMF1 ¶ 12; PRDSMF1 ¶ 12.  Dr. Madigan was the first radiologist to set up a meeting with Mr. Cutler and was very interested in working for Spectrum at the time, having indicated to his partners

---

[7]      DSMF1 ¶ 12 also states that the reason Dr. Madigan asked for this information was "so he could decide if he was interested in working for Spectrum."  The Plaintiff interposed a qualified response denying that Dr. Madigan indicated this reason in the phone conversation, and stating that Dr. Madigan was "very interested in working for Spectrum at that time" and had indicated to his partners that he was "going to retire from" SMMC.  PRDSMF1 ¶ 12.  In compliance with its obligation to view the facts in the light most favorable to Dr. Madigan, the Court has excluded this portion of DSMF1 ¶ 12.

[8]      Spectrum interposed a qualified response, arguing that Mr. Cutler possessed no decision-making authority regarding Dr. Madigan's potential employment with Spectrum.  DRPSAMF1 ¶ 59. In compliance with its obligation to view the facts in the light most favorable to Dr. Madigan, the Court declines to accept Spectrum's qualification.

that he was "going to retire from Southern Maine Medical Center."[9]  While working

at SMMC was his preference, Dr. Madigan was, as a fallback, inquiring elsewhere

about job opportunities, including one in Machias, Maine, a one-way travel distance

of 218 miles from Portland.[10]   PSAMF1 ¶ 56; DRPSAMF1 ¶ 56.  Drs. Merriam,

Tupper and Weltin also expressed an interest in seeking employment opportunities

with Spectrum following the meeting on March 4, 2010.  DSMF1 ¶ 19; PRDSMF1 ¶

19.

Spectrum does not like to hire doctors who are difficult to work with,

uncooperative, inflexible, or argumentative.[11]   PSAMF1 ¶ 42; DRPSAMF1 ¶ 42;

PSAMF2 ¶ 34; DRPSAMF2 ¶ 34.  Because of SMMC's reports, it was unlikely that

Spectrum would add Dr. Madigan to the practice or look to add him to the

practice.[12]  PSAMF1 ¶ 43; DRPSAMF1 ¶ 43; PSAMF2 ¶ 35; DRPSAMF2 ¶ 35.  Mr.

Cutler, before he interviewed Dr. Madigan, was told by Mr. Landry that the latter

---

[9]     Spectrum interposed a qualified response, arguing that Dr. Madigan "expressed an interest
in working for Spectrum only in southern Maine as a diagnostic radiologist."  DRPSAMF1 ¶ 56.  The
Court finds that the Plaintiff's statement is supported by the record citation, *see* DSMF2 Attach. 3,
*Videotape Dep. of Stephen M. Madigan, M.D.*, 39:16–18, and, in compliance with its obligation to
view the facts in the light most favorable to Dr. Madigan, declines Spectrum's attempt to qualify the
statement.

[10]    Spectrum interposed a qualified response, arguing that Dr. Madigan "expressed an interest
in working for Spectrum only in southern Maine as a diagnostic radiologist."  DRPSAMF1 ¶ 57.
After reviewing Dr. Madigan's testimony, *see* DSMF2 Attach. 3, *Videotape Dep. of Stephen M.
Madigan, M.D.*, 37:7–43:4, the Court has amended the statement to avoid the implication that Dr.
Madigan asked Mr. Cutler, during the March 5, 2010, phone call, about any job opportunities at
Spectrum other than the one located primarily at SMMC.

[11]    SMMC interposed a qualified response to PSAMF2 ¶ 34.  DRPSAMF2 ¶ 34.  SMMC's
response includes additional testimony from Mr. Landry that does not contradict the Plaintiff's
statement.  In compliance with its obligation to view the facts in the light most favorable to Dr.
Madigan, the Court has included PSAMF2 ¶ 34 as written.

[12]    Spectrum interposed a qualified response to PSAMF1 ¶ 43, and SMMC denied PSAMF2 ¶
35.  DRPSAMF1 ¶ 43; DRPSAMF2 ¶ 35.  As the Plaintiff's version of the facts is supported by the
record citation, *see* DRPSAMF1 Attach. 4, *30(b)(6) Dep. of Spectrum Medical Group, P.A., (David
Landry)*, 34:13–17, and as the Court is obligated to view the facts in the light most favorable to Dr.
Madigan, the Court has included the Plaintiff's version.

"had had some initial discussions with the hospital regarding Dr. Madigan" that the two would have to discuss.[13]  PSAMF1 ¶ 44; DRPSAMF1 ¶ 44.

On March 8, 2010, Mr. Cutler and Dr. Madigan met for approximately one hour to discuss Dr. Madigan's professional background and his interest in employment opportunities with Spectrum.  DSMF1 ¶ 13; PRDSMF1 ¶ 13; DSMF2 ¶ 23; PRDSMF2 ¶ 23.  Dr. Madigan expressed an interest in working for Spectrum in southern Maine as a diagnostic radiologist.  DSMF1 ¶ 13; PRDSMF1 ¶ 13.  Dr. Madigan did not have a subspecialty in breast imaging.  DSMF1 ¶ 13; PRDSMF1 ¶ 13.  Dr. Madigan did not express an interest in seeking a position as a Medical Director.  DSMF1 ¶ 13; PRDSMF1 ¶ 13.  During their meeting, Dr. Madigan never provided Mr. Cutler with his resume and never disclosed his age to Mr. Cutler. DSMF1 ¶ 13; PRDSMF1 ¶ 13.  During his interview with Dr. Madigan, Mr. Cutler stated "that sometimes with services changes hospitals like to have new faces and a different approach."[14]  PSAMF1 ¶ 58; DRPSAMF1 ¶ 58.

Following the meeting on March 8, 2010, Mr. Cutler told Mr. Landry about his meeting with Dr. Madigan, including Dr. Madigan's stated desire to work in

---

[13]    Spectrum interposed a qualified response, arguing that no one from SMMC ever told Messers. Landry or Cutler that SMMC did not want Dr. Madigan to work there because of his age. In compliance with its obligation to view the facts in the light most favorable to Dr. Madigan, the Court has included PSAMF1 ¶ 44 as written.

[14]    Spectrum interposed a qualified response to the first sentence of PSAMF1 ¶ 58, but Spectrum's response does not contradict that Mr. Cutler made this statement to Dr. Madigan. DRPSAMF1 ¶ 58.  In compliance with its obligation to view the facts in the light most favorable to Dr. Madigan, the Court rejects Spectrum's qualifications.

Spectrum denied the second sentence of PSAMF1 ¶ 58, which stated that Dr. Madigan had been with SMMC longer than any other current radiologist.  DRPSAMF1 ¶ 58.  Spectrum's denial contends that the Plaintiff's record citation does not support the assertion.  *Id.*  After reviewing the record citation, the Court finds that the record citation does not support the assertion, and has accordingly excluded the second sentence of PSAMF1 ¶ 58.

southern Maine.[15]  DSMF1 ¶ 14; PRDSMF1 ¶ 14.  Mr. Cutler's recommendation was that the interview process with Dr. Madigan continue; Mr. Cutler believed that Dr. Madigan had a skill set that could be used at SMMC.[16]  PSAMF1 ¶ 45; DRPSAMF1 ¶ 45.  In a three-way meeting among Mr. Cutler, Mr. Landry, and Mr. Clark, the Director of Operations, Mr. Landry told Mr. Cutler that SMMC did not desire to have Dr. Madigan work there anymore.[17]  PSAMF1 ¶ 46; DRPSAMF1 ¶ 46.

On March 18, 2010, the Southern Radiology Divisional Advisory Committee (SRDAC) met to discuss available employment positions at SMMC, as well as general staffing needs for the Southern Radiology Division (the Division).[18]  DSMF1 ¶ 15; PRDSMF1 ¶ 15.  During this meeting, Mr. Landry informed the SRDAC that SMMC had expressed a desire that Dr. Madigan provide no radiology services at

---

[15]     The Plaintiff objected and interposed a qualified response to DSMF1 ¶ 14.  The objection is based on hearsay, though the Plaintiff does not elaborate.  PRDSMF1 ¶ 14.  Spectrum responds that the objection should be deemed waived due to its lack of explanation, and that, moreover, the statement in question is not hearsay because it is not being offered to prove the truth of the matter asserted.  DRPSAMF1 ¶ 14.  Spectrum is correct.  The statement is being offered as evidence of Spectrum's internal discussions regarding Dr. Madigan, not as evidence of Dr. Madigan's desires.
        In addition, the Plaintiff argues that although Dr. Madigan did express a preference for southern Maine, he did not express a desire to work only in southern Maine.  The Court reviewed the record citations for DSMF1 ¶ 14 and discovered that Mr. Landry's account of the conversation did not include the word "only."  DSMF1 Attach. 1, *Aff. of David Landry* (*Landry Aff.*), ¶ 14.  In compliance with its obligation to view the facts in the light most favorable to Dr. Madigan, the Court has excluded the word "only" from DSMF1 ¶ 14.
[16]     Spectrum interposed a qualified response, arguing that PSAMF1 ¶ 45 was unsupported by the record citation.  After reviewing Mr. Cutler's deposition transcript, *see* DRPSAMF1 Attach. 5, *Dep. of: Jeffrey Cutler*, 25:9–21, the Court concludes that the testimony establishes that Mr. Cutler believed that Dr. Madigan had a skill set that could be used at SMMC, but not that Mr. Cutler made this recommendation to Mr. Landry.  The Court has amended PSAMF1 ¶ 45 accordingly.
[17]     Spectrum interposed a qualified response, but as Spectrum's response does not contradict the Plaintiff's statement, and as the Court is obligated to view the facts in the light most favorable to the Plaintiff, the Court has included the Plaintiff's version.
[18]     The Plaintiff objected to, qualified in part, and denied in part DSMF1 ¶ 15, an eight-sentence paragraph.  PRDSMF1 ¶ 15.  The Plaintiff appears to admit the first sentence of DSMF1 ¶ 15.

SMMC.[19] DSMF1 ¶ 15; PRDSMF1 ¶ 15.  Because of SMMC's stated preference, the SRDAC considered other potential employment opportunities with Spectrum. DSMF1 ¶ 15; PRDSMF1 ¶ 15.  However, at that time, Spectrum had no other available positions that Dr. Madigan was qualified to perform in southern Maine, the geographic region in which he had expressed an interest.  DSMF1 ¶ 15; PRDSMF1 ¶ 15.  In addition, given the reports that Dr. Madigan was difficult to work with, the SRDAC did not believe that Dr. Madigan would be a good addition to the practice at Spectrum.  DSMF1 ¶ 15; PRDSMF1 ¶ 15.  Accordingly, based on this information, the SRDAC made a decision not to consider Dr. Madigan for employment opportunities with Spectrum at that time.[20] DSMF1 ¶ 15; PRDSMF1 ¶ 15.

Following the meeting on March 18, 2010, Mr. Landry asked Mr. Cutler to call Dr. Madigan and tell him that Spectrum would not be considering him for employment because SMMC had expressed its desire not to have Dr. Madigan work

---

[19]      The Plaintiff objects that what Mr. Landry said is hearsay.  PRDSMF1 ¶ 15.  The Plaintiff does not elaborate.  Spectrum responds that the objection should be deemed waived due to its lack of explanation, and that, moreover, the statement is not hearsay because it is not being offered to prove the truth of the matter asserted.  DRPSAMF1 ¶ 15.  Spectrum is correct.  The statement is being offered to prove what Mr. Landry told the SRDAC, not to prove how SMMC viewed Dr. Madigan or what SMMC had told Mr. Landry.
          The Plaintiff also contends that SMMC did not indicate a desire not to have Dr. Madigan provide services "primarily at SMMC," but "a desire that Dr. Madigan provide no services at SMMC."  PRDSMF1 ¶ 15.  In compliance with its obligation to view the facts in the light most favorable to the Plaintiff, the Court has amended DSMF1 ¶ 15 accordingly.
[20]      The Plaintiff denied the last two sentences of DSMF1 ¶ 15, which stated that the SRDAC's decision had nothing to do with Dr. Madigan's age.  To support his denial, the Plaintiff noted that Mr. Cutler made age-related comments to Dr. Madigan when informing him of Spectrum's decision not to hire him.  In compliance with its obligation to view the facts in the light most favorable to the Plaintiff, the Court has excluded the last two sentences of DSMF1 ¶ 15.

in the Radiology Department at SMMC.[21]   DSMF1 ¶ 18; PRDSMF1 ¶ 18.   Mr. Cutler possessed no decision-making authority regarding Dr. Madigan's potential employment with Spectrum.[22]   DSMF1 ¶ 16; PRDSMF1 ¶ 16.   According to Spectrum's by-laws, the SRDAC has exclusive authority to hire and fire personnel within the Division.   DSMF1 ¶ 16; PRDSMF1 ¶ 16.   In addition, Mr. Cutler never spoke with Dr. Lavoie about any issue he had with Dr. Madigan.   DSMF1 ¶ 16; PRDSMF1 ¶ 16.   Mr. Cutler participated in the meetings of the SRDAC on an intermittent basis and, if invited, would sit through the entire meeting.   PSAMF1 ¶ 60; DRPSAMF1 ¶ 60.   Mr. Cutler remembers observing a meeting of the SRDAC which touched upon Dr. Madigan in mid-March of 2010.   PSAMF1 ¶ 60; DRPSAMF1 ¶ 60.   However, Mr. Cutler was not present at the SRDAC meeting where the decision was made not to consider Dr. Madigan for employment and Mr. Cutler did not make any recommendations to the SRDAC about whether to consider Dr. Madigan for employment with Spectrum.[23]   DSMF1 ¶ 17; PRDSMF1 ¶ 17.

On March 23, 2010, Dr. Madigan was informed by Mr. Cutler that Spectrum could not hire him at SMMC, because of SMMC's concerns that he was "old" and "had worked there long enough and they wanted a new face."[24]   PSAMF1 ¶ 47;

---

[21]   The Plaintiff interposed a qualified response to DSMF1 ¶ 18, but that response does not dispute the first sentence of that paragraph.  PRDSMF1 ¶ 18.

[22]   The Plaintiff interposed a qualified response, relating additional facts regarding Mr. Cutler's role but not contradicting the statements contained in DSMF1 ¶ 16.  PRDSMF1 ¶ 16.

[23]   The Plaintiff interposed a qualified response, relating additional facts regarding Mr. Cutler's role but not contradicting the statements contained in DSMF1 ¶ 17.  PRDSMF1 ¶ 17.

[24]   Spectrum objected and interposed a qualified response to this sentence.  DRPSAMF1 ¶ 47. Spectrum contends that the statement is inadmissible hearsay.  Indeed, Spectrum argues that the statement "contains hearsay, within hearsay, within hearsay" and notes that "the original declarant is unknown."  *Id.*  In response, Dr. Madigan argues that the statement is being offered "to establish

DRPSAMF1 ¶ 47; PSAMF2 ¶ 36; DRPSAMF2 ¶ 36; DSMF2 ¶ 24; PRDSMF2 ¶ 24. In the same conversation, Dr. Madigan asked whether Spectrum had any other positions available, and was told, "we need you working at the hospital most of the time, and there are no other positions presently available in Spectrum to place you at, so . . . at this point in time since we cannot place you at the hospital we can – we cannot offer you a position."[25]   PSAMF1 ¶ 49; DRPSAMF1 ¶ 49; PSAMF2 ¶ 38; DRPSAMF2 ¶ 38. Spectrum had two other radiology positions open at the time, in North Conway, New Hampshire, and Bangor, Maine. PSAMF1 ¶ 49; DRPSAMF1 ¶ 49; DSMF2 ¶ 27; PRDSMF2 ¶ 27. Dr. Madigan inquired as to other openings at Spectrum and was told "there are no other openings."[26]  PSAMF1 ¶ 47; DRPSAMF1 ¶ 47; PSAMF2 ¶ 36; DRPSAMF2 ¶ 36. At the close of this conversation, Mr. Cutler

---

Spectrum's state of mind." *Pl.'s Evid. Resp. 1* at ¶ 47. Dr. Madigan also argues that the statement is admissible as an admission by an authorized agent of a party opponent. *Id.*

Though the statement might be inadmissible hearsay if offered to prove that SMMC was concerned about Dr. Madigan's age, here it is being offered as evidence of Spectrum's reasons for declining to hire Dr. Madigan. Mr. Cutler had been asked by Spectrum's CEO to communicate Spectrum's decision to Dr. Madigan. Accordingly, this statement is an opposing party's statement made by a person whom the party authorized to make a statement on the subject, and therefore not hearsay under FED. R. EVID. 801(d)(2)(C).

Spectrum's response to PSAMF1 ¶ 47 goes on to recite numerous additional facts regarding the circumstances surrounding Spectrum's decision not to hire Dr. Madigan. DRPSAMF1 ¶ 47. In compliance with its obligation to view the facts in the light most favorable to Dr. Madigan, the Court rejects this portion of Spectrum's response as argument.

[25]    Spectrum interposed a qualified response, arguing that Dr. Madigan had not applied for any other positions with Spectrum, that Dr. Madigan did not want to leave Maine and was only licensed to practice in Maine, and that the SRDAC does not make hiring decisions for radiology positions in the Bangor area. DRPSAMF1 ¶ 49. The Court rejects Spectrum's response as argument.

[26]    Spectrum and SMMC both denied this sentence, arguing that Dr. Madigan did not apply for any positions with Spectrum other than the one at SMMC. DRPSAMF1 ¶ 47; DRPSAMF2 ¶ 47. The Plaintiff's statement is supported by the record, *see* DSMF2 Attach. 3, *Videotape Dep. of Stephen M. Madigan, M.D.* (*Madigan Dep.*), at 10:12–16, and the Court rejects the Defendants' responses as non-responsive.

stated, "It happens, you're old, and it's time for a new face."[27]  PSAMF1 ¶ 48;
DRPSAMF1 ¶ 48; PSAMF2 ¶ 37; DRPSAMF2 ¶ 37.

In March and April 2010, the leadership from the Division interviewed Drs.
Merriam, Tupper, and Weltin for positions as Diagnostic Radiologists in SMMC's
Radiology Department.  DSMF1 ¶ 20; PRDSMF1 ¶ 20.  Following these interviews,
the SRDAC recommended that the Division hire Drs. Merriam, Tupper, and Weltin.
DSMF1 ¶ 20; PRDSMF1 ¶ 20.  In April 2010, Spectrum offered Drs. Merriam and
Weltin full-time positions and Dr. Tupper a part-time position as Diagnostic
Radiologists.  DSMF1 ¶ 20; PRDSMF1 ¶ 20.  Drs. Merriam, Weltin, and Tupper
began working for Spectrum on May 1, 2010.  DSMF1 ¶ 20; PRDSMF1 ¶ 20.

The RFP from SMMC requested a radiologist with expertise in breast
imaging.  DSMF1 ¶ 21; PRDSMF1 ¶ 21.  Cameron Saber, M.D., worked for an
affiliate of Spectrum at a health care facility in Massachusetts.  DSMF1 ¶ 21;
PRDSMF1 ¶ 21.  Dr. Saber is a radiologist with a sub-specialty in breast imaging,
though he was not board-certified in 2010.  DSMF1 ¶ 21; PRDSMF1 ¶ 21; PSAMF1
¶ 61; DRPSAMF1 ¶ 61.  In June 2010, Spectrum offered Dr. Saber a full-time
position, contingent on his becoming board-certified, as a breast imaging specialist
in SMMC's Radiology Department.  DSMF1 ¶ 21; PRDSMF1 ¶ 21; PSAMF1 ¶ 61;

---

[27]    Spectrum interposed a qualified response, reciting numerous additional facts regarding the
circumstances surrounding Spectrum's decision not to hire Dr. Madigan, and arguing that age
played no role in Spectrum's decision-making process.  DRPSAMF1 ¶ 48.  In compliance with its
obligation to view the facts in the light most favorable to Dr. Madigan, the Court rejects Spectrum's
response as argument.

DRPSAMF1 ¶ 61.  Dr. Saber was placed on a partnership track.[28]  PSAMF1 ¶ 64;

DRPSAMF1 ¶ 64.

Dr. Madigan is a diagnostic radiologist and does not have a sub-specialty in

breast imaging; however, his former partner at SMIA, Dr. Tupper, did have a sub-

specialty in mammography.[29]   DSMF1 ¶ 22; PRDSMF1 ¶ 22; PSAMF1 ¶ 62;

DRPSAMF1 ¶ 62.   In 2010, ninety-one percent of Spectrum's Diagnostic

Radiologists in the Southern Radiology Division were forty years of age or older;

fifty-eight percent were in their fifties, sixties, or seventies.[30]   DSMF1 ¶ 23;

PRDSMF1 ¶ 23.  Drs. Merriam, Weltin, and Tupper were all in their fifties when

Spectrum hired them.  DSMF1 ¶ 24; PRDSMF1 ¶ 24.  Dr. Weltin, who was born on

September 27, 1951, is two weeks older than Dr. Madigan, who was born on October

13, 1951, and was fifty-eight when Spectrum declined to hire him.[31]  DSMF1 ¶ 24;

---

[28]    PSAMF1 ¶ 64 also states that "Dr. Cameron Saber was ultimately offered a position to fill
the slot that was formerly filled by Dr. Madigan."  Spectrum denied this assertion, arguing that Dr.
Saber was hired as a breast imaging specialist, and that Dr. Madigan does not have a sub-specialty in
breast imaging.  DRPSAMF1 ¶ 64.  Dr. Madigan's citation is to pages from Mr. Cutler's deposition
that are not in the record, so the Court cannot verify whether the Plaintiff's statement is supported
by the record.  In the absence of supporting evidence, and given Spectrum's contradictory response,
the Court must exclude this statement.

[29]    Spectrum interposed a qualified response, stating that Dr. Tupper chose to work for
Spectrum on a part-time basis.  DRPSAMF1 ¶ 62.  In compliance with its obligation to view the facts
in the light most favorable to the Plaintiff, the Court declines to accept Spectrum's qualification.

[30]    Dr. Madigan interposed a qualified response, stating additional facts but not disputing the
statement.  PRDSMF1 ¶ 23.  The Court rejects Dr. Madigan's response as non-responsive.

[31]    Dr. Madigan interposed a qualified response to DSMF1 ¶ 24, pointing out that Dr. Weltin is
only two weeks older than Dr. Madigan.  PRDSMF1 ¶ 24.  In compliance with its obligation to view
the facts in the light most favorable to Dr. Madigan, the Court has incorporated Dr. Madigan's
qualification.

PSAMF1 ¶ 63 also stated that Spectrum "refused to hire [Dr. Madigan] at SMMC's
direction," citing Dr. Madigan's MHRC Charge.  Spectrum denied and objected to this assertion on
the grounds that it is speculative and conclusory.  DRPSAMF1 ¶ 63.  Dr. Madigan responded that
his MHRC Charge is "clearly admissible to establish both the discriminatory bias and Spectrum's
knowledge of that bias."  *Pl.'s Evid. Resp. 1* at ¶ 63.  The Court is "not obligated to take at face value
[Dr. Madigan's] subjective beliefs when they are not factually based and merely constitute

PRDSMF1 ¶ 24; PSAMF1 ¶ 63; DRPSAMF1 ¶ 63; PSAMF1 ¶ 66; DRPSAMF1 ¶ 66. Dr. Saber was forty years old when offered a position by Spectrum in SMMC's Radiology Department.  DSMF1 ¶ 24; PRDSMF1 ¶ 24; PSAMF1 ¶ 65; DRPSAMF1 ¶ 65.

### 6.  Dr. Merriam's Views

Dr. Merriam, who had worked with Dr. Madigan since 1997, found Dr. Madigan to be collegial, friendly, and talkative, in contrast with Dr. Tupper, who "really wasn't interested in what the rest of us were doing during the day."[32] PSAMF1 ¶ 50; DRPSAMF1 ¶ 50; PSAMF2 ¶ 39; DRPSAMF2 ¶ 39.  Dr. Merriam felt that SMIA had a group cohesion problem but he did not blame Dr. Madigan more than any other member of the group for this lack of cohesion, feeling that it was a shared fault.  PSAMF1 ¶ 51; DRPSAMF1 ¶ 51; PSAMF2 ¶ 40; DRPSAMF2 ¶ 40.  If there were a problem with group management in November 2009, responsibility would primarily fall upon the Radiology Chief at that time, Dr. Tupper.[33]  PSAMF1 ¶ 52; DRPSAMF1 ¶ 52; PSAMF2 ¶ 41; DRPSAMF2 ¶ 41.  Drs. Merriam, Madigan, and Weltin all played well together, all showed cooperation with

---

[32]    conclusory, self-serving statements," *Torrech-Hernandez v. General Electric Co.*, 419 F.3d 41, 47 n.1 (1st Cir. 2008), and has accordingly excluded this portion of PSAMF1 ¶ 63.

[32]    Spectrum interposed qualified responses to PSAMF1 ¶¶ 50–53 and 55, contending that Dr. Merriam was not surprised to hear that Spectrum did not hire Dr. Madigan.  DRPSAMF2 ¶¶ 50–53 and 55.  In compliance with its obligation to view the facts in the light most favorable to Dr. Madigan, the Court rejects Spectrum's qualified responses.

[33]    SMMC objected to and denied PSAMF2 ¶ 41.  DRPSAMF2 ¶ 41.  SMMC's objection is as to form, since Dr. Merriam had immediately prior to making this statement testified that he disagreed that there was a lack of group management at the time.  *Id.*  The Court has amended the statement to avoid the implication that Dr. Merriam believed there was a lack of group management in November 2009.  SMMC's denial is supported by Dr. Merriam's testimony "that there were always group leadership problems at SMIA, including in 2007 and 2008 when Dr. Madigan was the Chief of Radiology."  *Id.*  In compliance with its obligation to view the facts in the light most favorable to Dr. Madigan, the Court rejects SMMC's denial.

each other, and all showed teamwork, in contrast with Dr. Tupper, who did not play well with Drs. Merriam and Weltin.[34]  PSAMF1 ¶ 53; DRPSAMF1 ¶ 53; PSAMF2 ¶ 42; DRPSAMF2 ¶ 42.   A service called Avatar rates radiology departments nationwide and always gave SMIA five stars, its highest rating.[35]  PSAMF1 ¶ 54; DRPSAMF1 ¶ 54; PSAMF2 ¶ 43; DRPSAMF2 ¶ 43.  Dr. Merriam did not find Dr. Madigan to be uncooperative or inflexible or argumentative or difficult to work with.   PSAMF1 ¶ 55; DRPSAMF1 ¶ 55; PSAMF2 ¶ 44; DRPSAMF2 ¶ 44.   In contrast, he found him to be a "pretty genial guy."  PSAMF1 ¶ 55; DRPSAMF1 ¶ 55; PSAMF2 ¶ 44; DRPSAMF2 ¶ 44.

### 7.    The Agreement Between Spectrum and SMMC[36]

On May 1, 2010, Spectrum entered into an Agreement with SMMC to provide radiology services at SMMC.  DSMF1 ¶ 26; PRDSMF1 ¶ 26.  The Agreement requires Spectrum to designate a Medical Director of Radiology and an Assistant Medical Director of Radiology, and to assign at least two qualified radiologists to provide on-site coverage at SMMC between 8:00 a.m. and 5:00 p.m., Monday

---

[34]    SMMC interposed a qualified response, pointing out that, in the cited testimony, Dr. Merriam states that Dr. Tupper did not play well with Drs. Merriam and Weltin, without reference to Dr. Madigan.  DRPSAMF2 ¶ 42.  The Court has amended the Plaintiff's statement accordingly.

[35]    Spectrum and SMMC both interposed qualified responses, pointing out that Dr. Merriam did not know whether Avatar had always given his group a five-star rating.  DRPSAMF1 ¶ 54; DRPSAMF2 ¶ 43.  In compliance with its obligation to view the facts in the light most favorable to Dr. Madigan, the Court has included the Plaintiff's version.

[36]    PSAMF1 ¶ 67, a nineteen-sentence long paragraph, contains numerous facts regarding the relationship between SMMC and SMIA.  Spectrum objected to PSAMF1 ¶ 67 on the grounds that these statements are not relevant or material to this matter and that the paragraph is speculative and lacks proper foundation.  DRPSAMF1 ¶ 67.  Dr. Madigan responds that "the prior course of dealings between SMMC and its earlier radiology provider, SMIA, helps inform the fact-finder as to what the likely future course of dealings would be between SMMC and Spectrum."  *Pl.'s Evid. Resp. 1* at ¶ 67.  The Plaintiff, however, has provided no reason for assuming that SMMC's agreement with Spectrum would likely mirror SMMC's agreement with SMIA.  The Court concludes that the facts contained in PSAMF1 ¶ 67 are not admissible to prove the contents of SMMC's agreement with Spectrum.

through Friday.  DSMF1 ¶ 26; PRDSMF1 ¶ 26.  The Agreement also requires Spectrum to provide or arrange for nighttime coverage through Nighthawk Radiology Services, LLC.  DSMF1 ¶ 26; PRDSMF1 ¶ 26.

Although, under the terms of the Agreement, SMMC has the right to approve the individuals designated by Spectrum to serve as Medical Director and Assistant Medical Director, SMMC does not have any right under the Agreement to identify or veto the physicians that Spectrum assigns to SMMC to provide clinical radiology services, assuming that those physicians are members in good standing of the SMMC medical staff, with full clinical privileges, that they comply at all times with SMMC's by-laws, rules, and regulations, and that they adhere to all applicable institutional policies and procedures.[37]  DSMF1 ¶ 27; PRDSMF1 ¶ 27.

The Agreement requires Spectrum to assign two radiologists to work at SMMC each weekday.  DSMF1 ¶ 28; PRDSMF1 ¶ 28.  However, Spectrum assigns four radiologists each weekday and has a total of thirty-six radiologists who are credentialed to work at SMMC.  DSMF1 ¶ 28; PRDSMF1 ¶ 28.  All of the radiologists Spectrum assigns to work at SMMC also work at other hospitals and healthcare facilities in southern Maine.  DSMF1 ¶ 28; PRDSMF1 ¶ 28.

---

[37]     The Plaintiff denied the statement as originally drafted, *see* DSMF1 ¶ 27, arguing that every radiologist assigned by Spectrum to work at SMMC must be a member in good standing of the SMMC medical staff, with full clinical privileges, must comply at all times with the requirements of SMMC's by-laws, rules, and regulations, and must adhere to all applicable institutional policies and procedures of SMMC.  PRDSMF1 ¶ 27.  The Plaintiff also contends that Spectrum made it clear in negotiations that Dr. Madigan could not be hired by Spectrum to work at SMMC.  *Id.*  The latter argument is non-responsive, since the statement discusses only the terms of the Agreement. However, in compliance with its obligation to view the facts in the light most favorable to the Plaintiff, the Court has incorporated the Plaintiff's qualifications relating to SMMC's rights under the agreement.

Spectrum prepares its schedules one year in advance and provides those schedules to SMMC so that SMMC is aware of who will be working at the hospital on any given day.[38]  DSMF1 ¶ 29; PRDSMF1 ¶ 29.  SMMC compensates Spectrum for the work of the Medical Director, but makes no payment to Spectrum based on either the number of radiologists it assigns to SMMC or the number of hours those radiologists work.[39]  DSMF1 ¶ 30; PRDSMF1 ¶ 30.  Spectrum bills the patients or insurers directly for the professional services provided by its radiologists.  DSMF1 ¶ 30; PRDSMF1 ¶ 30.  Spectrum determines where its radiologists will be assigned to work, how many hours a week they will work, whether they will be on call, how many weeks of vacation they are eligible to take, what benefits they will receive, and how they will be compensated.[40]  DSMF1 ¶ 31; PRDSMF1 ¶ 31.

SMMC, in its relationship with Spectrum, continues to have significant control over the work environment for the radiologists from Spectrum who work at

---

[38]     DSMF1 ¶ 29 also states that "SMMC has no control over (or input into) which radiologists will be working at the hospital."  DSMF1 ¶ 29.  The Plaintiff interposed a qualified response that disputes this portion of DSMF1 ¶ 29, citing conditions from the Agreement between SMMC and Spectrum, and arguing that SMMC made it clear that Dr. Madigan could not be hired by Spectrum to work at SMMC.  PRDSMF1 ¶ 29.  In compliance with its obligation to view the facts in the light most favorable to Dr. Madigan, the Court has excluded this portion of DSMF1 ¶ 29.

[39]     The Plaintiff interposed a qualified response to DSMF1 ¶ 30.  PRDSMF1 ¶ 30.  However, as the Plaintiff's response does not appear to contradict any of the information contained in DSMF1 ¶ 30, the Court rejects the Plaintiff's response as non-responsive.

[40]     The Plaintiff denied DSMF1 ¶ 31.  PRDSMF1 ¶ 31.  DSMF1 ¶ 31 contains the broad assertions that Spectrum "sets the terms and conditions of employment for the radiologists who provide services at SMMC" and that "SMMC has no control over and provides no input into" those terms and conditions.  In his response, the Plaintiff provides examples of ways in which SMMC controls certain working conditions for the radiologists that work there.  PRDSMF1 ¶ 31.  Accordingly, in compliance with its obligation to view the facts in the light most favorable to the Plaintiff, the Court has excluded the portions of DSMF1 ¶ 31 that are contradicted by the Plaintiff's response.  However, the Plaintiff does not appear to dispute that Spectrum "determines where [its] radiologists will be assigned to work, how many hours a week they will work, whether or not they will be on call, how many weeks of vacation they are eligible to take, what benefits [they] will receive, and how they will be compensated."  DSMF1 ¶ 31; PRDSMF1 ¶ 31.

SMMC.[41]  PSAMF1 ¶ 68; DRPSAMF1 ¶ 68.  SMMC, in its current contract with Spectrum, is required, at its expense, to provide Spectrum's radiologists with facilities, equipment, supplies, and support personnel necessary for them to perform their services.[42]  PSAMF1 ¶ 68; DRPSAMF1 ¶ 68.  SMMC reserves the right to determine what facilities, equipment, supplies, and support personnel are necessary for those radiologists.  PSAMF1 ¶ 68; DRPSAMF1 ¶ 68.  All of the support personnel supplied to Spectrum's radiologists are employees of SMMC under SMMC's exclusive control.  PSAMF1 ¶ 68; DRPSAMF1 ¶ 68.  Spectrum is required to provide proof of professional liability insurance to SMMC in minimum limits established by SMMC.  PSAMF1 ¶ 68; DRPSAMF1 ¶ 68.  Spectrum must provide SMMC with written notice of the cancellation, expiration, or non-renewal of such insurance.  PSAMF1 ¶ 68; DRPSAMF1 ¶ 68.

Any physician working for Spectrum at SMMC must be a member of the medical staff and credentialed by both the medical staff and the Board of Directors of SMMC.  PSAMF1 ¶ 68; DRPSAMF1 ¶ 68.  Spectrum is required to provide two qualified radiologists on site between 8:00 a.m. and 5:00 p.m., Monday through Friday.  PSAMF1 ¶ 68; DRPSAMF1 ¶ 68.  A Spectrum radiologist must interpret,

---

[41]     Spectrum denied and objected to this sentence as speculative and conclusory, arguing that the non-moving party is entitled only to reasonable inferences that may be drawn from competent evidence, supported by appropriate record citations.  DRPSAMF1 ¶ 68.  Dr. Madigan responds that this sentence "is offered to explain the following sentences and is a reasonable conclusion based upon every succeeding sentence in paragraph 68."  *Pl.'s Evid. Resp. 1* at ¶ 68.  The Court concludes that this sentence is admissible as a reasonable summary of the competent evidence that follows.

[42]     Spectrum interposed a qualified response to this sentence and to the rest of PSAMF1 ¶ 68, arguing that the Agreement "speaks for itself, so the document, rather than Plaintiff's characterization of what the document states, should be relied upon."  DRPSAMF1 ¶ 68.  Spectrum does not contend, however, that the Plaintiff's statement of facts is unsupported by the contents of the Agreement.  Accordingly, in compliance with its obligation to view the facts in the light most favorable to the Plaintiff, the Court rejects Spectrum's response.

dictate, and sign a radiology report within twenty-four hours after the imaging is completed, and must immediately handle all emergency interpretations. PSAMF1 ¶ 68; DRPSAMF1 ¶ 68. Spectrum must assure that, during its on-site coverage hours, telephone and in-person consultation by the radiologist is readily available to physicians, residents, interns, and medical students. PSAMF1 ¶ 68; DRPSAMF1 ¶ 68. Spectrum, after hours, may use only Nighthawk Radiology Services, LLC, must review and sign the report prepared by Nighthawk within twenty-four hours of the preliminary interpretation, and cannot utilize any other after-hour coverage entity without the prior approval of SMMC. PSAMF1 ¶ 68; DRPSAMF1 ¶ 68. The work stations SMMC provides may be used solely for the reading of SMMC imaging studies. PSAMF1 ¶ 68; DRPSAMF1 ¶ 68. The radiologist at Spectrum who serves as Medical Director must be approved by SMMC. PSAMF1 ¶ 68; DRPSAMF1 ¶ 68.

Spectrum agrees that it will, as necessary, reassign any claims for payment to SMMC, with SMMC having final authority to determine the professional fee for said reassigned claims and having the right to audit Spectrum's documentation and records necessary to support such reassignments. PSAMF1 ¶ 68; DRPSAMF1 ¶ 68. Spectrum agrees to timely provide any and all attestations needed by SMMC to satisfy its Medicare documentation requirements. PSAMF1 ¶ 68; DRPSAMF1 ¶ 68. The individual approved by SMMC to serve as Medical Director may be terminated by SMMC and SMMC "in its sole discretion" may either approve a substitute physician or terminate the Medical Director services required of Spectrum. PSAMF1 ¶ 68; DRPSAMF1 ¶ 68. All charts created by Spectrum are the property

of SMMC and Spectrum may not remove original records or charts from the hospital.  PSAMF1 ¶ 68; DRPSAMF1 ¶ 68.  Spectrum's radiologists are required to complete medical records in a timely manner and its physicians are required to abide by all applicable institutional policies of SMMC, including its code of ethical conduct.  PSAMF1 ¶ 68; DRPSAMF1 ¶ 68.  Every radiologist assigned by Spectrum to work at SMMC must be a member in good standing of the SMMC medical staff, with full clinical privileges, must comply at all times with the requirements of SMMC's by-laws, rules, and regulations, and must adhere to all applicable institutional policies and procedures of SMMC.  PSAMF1 ¶ 68; DRPSAMF1 ¶ 68. Should any physician assigned to SMMC fail to meet these requirements, Spectrum must immediately notify SMMC.  PSAMF1 ¶ 68; DRPSAMF1 ¶ 68.

Spectrum has no authority or control over the terms and conditions of employment for SMMC's employees; nor does Spectrum know how SMMC's employees are compensated.  DSMF1 ¶ 32; PRDSMF1 ¶ 32.  Spectrum has no involvement in or control over the operations of SMMC.  DSMF1 ¶ 32; PRDSMF1 ¶ 32.

### 8.   Spectrum's Workforce and Management

During 2009, Spectrum had 77 employees and 103 physician shareholders. DSMF1 ¶ 33; PRDSMF1 ¶ 33.  During 2010, Spectrum had 71 employees and 102 physician shareholders.  DSMF1 ¶ 33; PRDSMF1 ¶ 33.

Spectrum is owned and directed by its shareholder physicians who each have a substantial ownership stake in Spectrum.  DSMF1 ¶ 34; PRDSMF1 ¶ 34. Spectrum's shareholder physicians possess significant control in the operations of

the business, and have a stake in the profits and losses of Spectrum.  DSMF1 ¶ 34; PRDSMF1 ¶ 34.  Each physician shareholder participates in annual, regular, and special shareholder meetings, and is entitled to vote on some of Spectrum's decisions.[43]  DSMF1 ¶ 34; PRDSMF1 ¶ 34.  The compensation of the shareholder physicians is directly tied to the profits or losses of Spectrum, though the bulk of shareholder compensation is paid as wages.  DSMF1 ¶ 34; PRDSMF1 ¶ 34.

A shareholder of Spectrum may sell his shares only to the corporation. PSAMF1 ¶ 69; DRPSAMF1 ¶ 69.  The price for a share is $1,000.  PSAMF1 ¶ 69; DRPSAMF1 ¶ 69.

No individual shareholder physician can terminate the employment of another shareholder physician.  DSMF1 ¶ 35; PRDSMF1 ¶ 35.  The SRDAC has exclusive authority to fire personnel within the division.[44]  PSAMF1 ¶ 69; DRPSAMF1 ¶ 69.  Shareholder physicians can be terminated only under the following conditions: (i) the Divisional Committee recommends to the Board of

---

[43]     The Plaintiff interposed a qualified response to DSMF1 ¶ 34.  PRDSMF1 ¶ 34.  DSMF1 ¶ 34 contains four sentences and at least that many different assertions; the Plaintiff disputes only two of these: the portion of compensation tied to profits, and the role of shareholder physicians in Spectrum's decision-making process.  PRDSMF1 ¶ 34.  In compliance with its obligation to view the facts in the light most favorable to Dr. Madigan, the Court has amended DSMF1 ¶ 34 to incorporate Dr. Madigan's qualifications.

     The Plaintiff asserts in PSAMF1 ¶ 69 that, "[a]lthough shareholders vote for the appointment of two advisory committees for the northern and southern divisions, as well as the Board of the company, actual day-to-day operation of hiring decisions are made by the advisory committee."  Spectrum denies that this sentence is supported by the record citation.  DRPSAMF1 ¶ 69.  Although both the sentence in PSAMF1 ¶ 69 and the record citation are vague and ambiguous, the record citation does not refer to "day-to-day operation of hiring decisions."  PSAMF1 ¶ 69.  If the Plaintiff means by this sentence that the SRDAC has authority over hiring and firing decisions, the Court has included that fact elsewhere in its recitation of the facts.

[44]     Spectrum interposed a qualified response to this sentence, noting that the record citation is preceded and qualified by the phrase, "according to Spectrum's by-laws."  DRPSAMF1 ¶ 69.  In compliance with its obligation to view the facts in the light most favorable to the Plaintiff, the Court declines to accept Spectrum's qualification.

27

Directors of Spectrum (or the Board of Directors recommends on its own) that the shareholder physician be terminated; (ii) the Board of Directors approves termination by an affirmative vote of at least two-thirds of the Directors then serving; and (iii) the termination is approved by an affirmative vote of at least two-thirds of the shareholder physicians serving in the applicable Division.[45]  DSMF1 ¶ 35; PRDSMF1 ¶ 35; PSAMF1 ¶ 69; DRPSAMF1 ¶ 69.

### 9.    Spectrum and Discrimination

Spectrum has an established policy that prohibits discrimination on the basis of age.[46]  DSMF1 ¶ 36; PRDSMF1 ¶ 36.  Spectrum distributes copies of its anti-discrimination policy to all of its shareholders and employees.  DSMF1 ¶ 36; PRDSMF1 ¶ 36.  Spectrum provides regular training to all of its shareholders and employees regarding the anti-discrimination policy.  DSMF1 ¶ 36; PRDSMF1 ¶ 36.  With the exception of Dr. Madigan's claim, Spectrum has not received a complaint of discrimination from an employee in Maine during the past five years or more.  DSMF1 ¶ 36; PRDSMF1 ¶ 36.

## II.    THE PARTIES' POSITIONS

### A.    Count I: Age Discrimination

#### 1.    Spectrum's Motion

---

[45]    The Plaintiff interposed a qualified response to DSMF1 ¶ 35, and included an additional material fact, stating that a Division has never not affirmed the Board's decision to terminate a shareholder physician.  PRDSMF1 ¶ 35; PSAMF1 ¶ 69.  However, the Plaintiff cites page fifty-eight of Mr. Landry's deposition transcript, a page which is not in the record.  Spectrum denies the statement.  DRPSAMF1 ¶ 69.  As the Court cannot verify that the Plaintiff's statement is supported by the record, it must exclude the Plaintiff's statement.

[46]    The Plaintiff interposed a qualified response to DSMF1 ¶ 36, rehearsing the events that gave rise to this lawsuit.  PRDSMF1 ¶ 36.  The Court rejects the Plaintiff's response as non-responsive, since it does not contradict any of the specific facts set forth in DSMF1 ¶ 36.

Spectrum first argues that Dr. Madigan cannot establish a prima facie case of age discrimination. *Spectrum's Mot.* at 8–9. Next, Spectrum contends that age played no part in Spectrum's decision not to consider Dr. Madigan for employment; indeed, that it did not know Dr. Madigan's age. *Id.* at 9–11. Spectrum argues that, because it acted without knowledge of Dr. Madigan's protected status, it is entitled to judgment as a matter of law. *Id.* at 10–11. Spectrum then argues that Spectrum has articulated a legitimate, nondiscriminatory reason for not considering Dr. Madigan for employment, and insists that that reason was not a pretext for age discrimination. *Id.* at 11–12. Spectrum asserts that Dr. Madigan cannot establish direct evidence of age discrimination, since Mr. Cutler possessed no decision-making authority regarding Dr. Madigan's potential employment with Spectrum. *Id.* at 12–13.

Spectrum contends that it is not a joint employer with respect to SMMC, and that, even if it were, Spectrum would not be liable for any alleged wrongdoing by SMMC. *Id.* at 14–15. Spectrum argues that it employs fewer than one hundred employees for purposes of the ADEA and MHRA. *Id.* at 15–17. Finally, Spectrum argues that it should not be held liable for punitive damages under either the ADEA or the MHRA. *Id.* at 17–20.

### 2.   The Plaintiff's Opposition

The Plaintiff begins by arguing that Dr. Madigan has established a prima facie case of age discrimination. *Pl.'s Opp'n 1* at 7. The Plaintiff then argues that Mr. Cutler's comments amount to "smoking gun evidence" of age discrimination,

and argues that SMMC's discriminatory animus should be attributed to Spectrum. *Id.* at 9–11.  Next, the Plaintiff argues that Spectrum is a joint employer with respect to SMMC.  *Id.* at 11–14.  The Plaintiff argues that Spectrum employs more than one hundred employees, though claims that this argument "is better made post-verdict and need not be made now."  *Id.* at 14–16.  Finally, the Plaintiff argues that Spectrum is liable for punitive damages.  *Id.* at 16–17.

### 3.   Spectrum's Reply

Spectrum notes that, on a motion for summary judgment, the non-moving party is entitled only to reasonable inferences that may be drawn from competent evidence, supported by appropriate record citations.  *Spectrum's Reply* at 1. Spectrum then returns to the joint employer issue, arguing that the Agreement between Spectrum and SMMC is irrelevant to this issue, since it was entered into nearly two months after Spectrum notified Dr. Madigan that it would not consider him for employment.  *Id.* at 2–4.  Next, Spectrum argues that Dr. Madigan cannot establish a prima facie case of age discrimination because Dr. Saber had a different skill set, and was not hired to replace Dr. Madigan.  *Id.* at 4–5.  Spectrum contends that Dr. Madigan's argument that Spectrum discriminated against him by failing to offer him positions in Bangor, Maine or North Conway, New Hampshire, has been waived because he first raised it in his Opposition.  *Id.* at 5.  Spectrum returns to the issue of Mr. Cutler's statements, and argues that they do not constitute direct evidence of discrimination because Mr. Cutler was not a decision-maker.  *Id.* at 6–8. Spectrum again argues that it employs fewer than one hundred employees for

purposes of the MHRA.  *Id.* at 8–10.  Finally, Spectrum insists that it has acted in good faith, and cannot be held liable for punitive damages.  *Id.* at 10.

### B.    Count II:  Tortious Interference

#### 1.    SMMC's Motion

SMMC begins by setting forth the elements of tortious intereference with a prospective economic advantage under Maine caselaw.  *SMMC's Mot.* at 5.  SMMC then asserts that Dr. Madigan's claim fails because he must, but cannot, prove either fraud or intimidation.  *Id.*

As for fraud, SMMC argues that there is no support in the record for Dr. Madigan's allegation that SMMC falsely told Spectrum that Dr. Madigan had failed to provide leadership to his group.  *Id.* at 7.  SMMC argues that, even if there were support for this allegation, Spectrum did not base its decision on that representation.  *Id.*

SMMC turns to whether SMMC intimidated Spectrum into not hiring Dr. Madigan, arguing that there is no evidence that Dr. Lavoie conditioned Spectrum's prospects for obtaining the contract for radiological services on a refusal to hire Dr. Madigan.  *Id.* at 8–13.  SMMC points out that, while it was not necessarily comfortable having Dr. Madigan work primarily at SMMC, it had no objection to his being hired by Spectrum for another location.  *Id.* at 13–14.

#### 2.    The Plaintiff's Opposition

Dr. Madigan argues that there is a jury issue of fraud because SMMC's claims that Dr. Madigan was inflexible, argumentative, uncooperative, and difficult

31

to work with, "had no basis in reality," and are contradicted by Dr. Merriam's testimony. *Pl.'s Opp'n* at 4–5. Dr. Madigan argues that Spectrum's decision not to hire Dr. Madigan was based on SMMC's negative reports. *Id.* at 5–6.

Dr. Madigan argues that there is a jury issue of intimidation because SMMC "made it clear to Spectrum that an implicit *quid pro quo* for its receiving the contract was that it not bring Dr. Madigan on board to work at the hospital," and this amounts to intimidation under *Currie v. Industrial Security Inc.*, 915 A.2d 400 (Me. 2007). *Id.* at 6–8.

### 3.   SMMC's Reply

SMMC argues that Dr. Madigan cannot prove that Spectrum relied on SMMC's allegedly false statements, and that without reliance there is no fraud. *SMMC's Reply* at 4. SMMC insists that Spectrum, in making its decision not to employ Dr. Madigan to work at SMMC, relied upon "the true statement that SMMC did not want Dr. Madigan working primarily at SMMC." *Id.* at 5. Moreover, SMMC contends that Spectrum did not consider Dr. Madigan for other locations not because of SMMC's statements, but because "Dr. Madigan gave Mr. Cutler the impression that he was interested only in positions located in the Greater Portland area, preferably at SMMC." *Id.* at 5–7.

SMMC argues that there could not have been any intimidation as a matter of law because Spectrum "did not even begin to consider any employment hires until after it had already secured SMMC's radiology contract." *Id.* at 3. SMMC

emphasizes that it had no objection to Spectrum's hiring Dr. Madigan for a different location. *Id.*

## III.   DISCUSSION

### A.   Summary Judgment

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). For summary judgment purposes, "genuine" means that "a reasonable jury could resolve the point in favor of the nonmoving party," and a "material fact" is one whose "existence or nonexistence has the potential to change the outcome of the case." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (citations omitted).

"The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case." *Phair v. New Page Corp.*, 708 F. Supp. 2d 57, 61 (D. Me. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Phair*, 708 F. Supp. 2d at 61 (citing *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004)). However, the Court is not "required to 'accept as true or to deem as a disputed material fact, each and every unsupported, subjective, conclusory, or imaginative statement' made by a party." *Bonefant-Igaravidez v. International Shipping Corp.*, 659 F.3d 120, 123 (1st Cir.

2011) (quoting *Torrech-Hernández v. Gen. Elec. Co.*, 519 F.3d 41, 47 (1st Cir. 2008)). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Munoz*, 896 F.2d at 8; *see also Vives v. Fajardo*, 472 F.3d 19, 21 (1st Cir. 2007).

### B.   Count I: Age Discrimination

Spectrum moves for summary judgment on Dr. Madigan's ADEA and MHRA claims against it. As Maine Courts generally apply the MHRA in accordance with federal anti-discrimination law, the Court's analysis pertains to both the ADEA and the MHRA claims. *See Phair v. New Page Corp.*, 708 F. Supp. 2d 57, 63 (D. Me. 2010); *see also Helwig v. Intercoast Career Inst.*, No. CV-09-225, 2012 Me. Super. LEXIS 29, *8–9 (Me. Super. Feb. 9, 2012).

### 1.   The Legal Framework

The ADEA makes it unlawful for an employer "to fail or refuse to hire . . . any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). ADEA plaintiffs must "establish that age was the 'but-for' cause of the employer's adverse action." *Velez v. Thermo King de P.R., Inc.*, 585 F.3d 441, 447 (1st Cir. 2009) (quoting *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 177 (2009)). The MHRA provides that it is unlawful employment discrimination "[f]or any employer to fail or refuse to hire or otherwise discriminate against any applicant for employment because of . . . age . . . ." 5 M.R.S.A. § 4572(1)(A).

## 2.    Dr. Madigan's Direct Evidence of Discrimination

Dr. Madigan's claim of age discrimination is unusually strong because—unlike many discrimination claims—he says that Spectrum came out and told him that they were not hiring him because of his age.  To place Spectrum's comment in context, in June 2009, Dr. Lavoie told Dr. Madigan, "You're old and your group is getting older."  Then, when Spectrum through Mr. Cutler informed Dr. Madigan why it would not hire him to work at SMMC, Mr. Cutler expressly told him that it was because SMMC was concerned that he was "old" and that he "had worked there long enough and they wanted a new face."  As if these statements were not sufficiently clear, Mr. Cutler closed the conversation by saying, "It happens, you're old, and it's time for a new face."  Typically, statements from a prospective employer that are this direct would be sufficient to command a jury trial.

The unusual wrinkle in this case is that Dr. Madigan has conceded for purposes of the motion for summary judgment that Mr. Cutler was not a decision-maker.  *Pl.'s Opp'n* at 10 ("Nor does it help that Mr. Cutler was not allegedly a decision-maker. . . . Indeed, it is clear that the ultimate *discriminatory animus* here is that of SMMC") (emphasis in Plaintiff's Opposition).  Relying principally on *Melendez-Arroyo v. Cutler-Hammer de P.R. Co., Inc.*, 273 F.3d 30, 35 (1st Cir. 2001), Spectrum observes that direct evidence "generally contemplates only those 'statements by a *decision-maker* that directly reflect the alleged animus and bear squarely on the contested employment decision,'" and it asserts that Mr. Cutler's statements are not direct evidence because Mr. Cutler was not a decision-maker.

Spectrum thus seeks to distance itself from the statements of its Director of Human Resources.

However, for summary judgment purposes, even assuming Mr. Cutler was not a decision-maker, whether his statements accurately reflected the reasons for Spectrum's decision remains  a genuine issue of material fact that must be resolved by a fact finder.  After all, although it is apparently undisputed that Mr. Cutler lacked the authority to decide whether to hire Dr. Madigan, Mr. Cutler was not a mere functionary; he was Spectrum's Director of Human Resources and chosen point of contact with Dr. Madigan.  Given his role, a reasonable fact-finder could conclude both that Mr. Cutler knew of Spectrum's age-based reasons for failing to hire Dr. Madigan and that he was speaking for Spectrum when he communicated those reasons to Dr. Madigan.  To accept Spectrum's narrow view of the facts—that Mr. Cutler was not only not a Spectrum decision-maker but was also not speaking for the Spectrum decision-maker—would require the Court to view the record in the light most favorable to Spectrum, not in the light most favorable to Dr. Madigan.

Nor does *Melendez-Arroyo* command a different result.  First, Spectrum's argument misplaces the emphasis in the quotation from *Melendez-Arroyo*.  What mattered in *Melendez-Arroyo* was not who made the statements, but whether the statements "directly reflect the alleged animus and bear squarely on the contested employment decision."  In *Melendez-Arroyo*, the statements were made by a decision-maker, but the Court observed that they were arguably not direct evidence of age discrimination because the man who made them "did not admit to being

motivated by [the plaintiff's] age or even refer to it in the meeting [to discuss her demotion]."[47]   *Melendez-Arroyo*, 273 F.3d at 34.   Here, Mr. Cutler's statements were made during a meeting with Dr. Madigan to inform him that Spectrum was no longer considering him for employment. Unlike the statements in *Melendez-Arroyo*, Mr. Cutler's statements bear squarely on the contested employment decision.

Second, *Melendez-Arroyo*'s definition of "direct evidence" was devised as a test for whether the plaintiff was entitled to a mixed-motive instruction.   *See Febres v. Challenger Caribbean Corp.*, 214 F.3d 57, 60 (1st Cir. 2000).   Here, the issue is not whether a mixed-motive instruction is appropriate[48] but whether a reasonable fact-finder could conclude, based on Dr. Madigan's evidence, that Spectrum failed to hire Dr. Madigan because of his age.   In answering that question, the Court may look to "any combination of evidence strong enough to permit the jury to infer discrimination."   *Melendez-Arroyo*, 273 F.3d at 36.   Given their context, and the fact that they corroborate the statements allegedly made by Dr. Lavoie, Mr. Cutler's statements would support such an inference.

### 3.   Joint Employers

Finally, Spectrum's argument that it is not a joint employer with SMMC is beside the point because Spectrum itself, not SMMC, was the potential employer. Whether SMMC could be considered a joint employer with Spectrum is of no

---

[47]   Nevertheless, the First Circuit vacated the district court's summary judgment in favor of the employer and remanded the matter to district court, making *Melendez-Arroyo* hardly convincing precedent for granting Spectrum's motion.   *See Melendez-Arroyo*, 273 F.3d at 35 ("Melendez's evidence . . . itself creates a factual issue for trial").

[48]   The Supreme Court held in 2009 that a mixed-motive instruction is never appropriate in an ADEA case.   *See Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 170 (2009).

moment in Dr. Madigan's direct claim against Spectrum. *See Torres-Negron v. Merck & Co., Inc.*, 488 F.3d 34, 41 n.6 (1st Cir. 2007) ("a finding that two companies are an employee's 'joint employers' only affects each employer's liability to the employee for their *own* actions, not for each other's actions").

### 4.   Damages

In its Motion for Summary Judgment, Spectrum argues that it employed fewer than one hundred employees for purposes of the ADEA and MHRA, and that it cannot be held liable for punitive damages under either the ADEA or the MHRA.

#### a.   The ADEA

Spectrum's argument that it cannot be held liable for punitive damages under the ADEA is inapposite: Dr. Madigan did not seek punitive damages under the ADEA in his Complaint, *see Am. Compl.* at ¶¶ 22–23 (seeking punitive damages under the MHRA and liquidated damages under the ADEA).

#### b.   The MHRA

##### i.   Punitive Damages

The MHRA allows for the recovery of punitive damages "if the complaining party demonstrates that the respondent engaged in a discriminatory practice . . . with malice or reckless indifference to the rights of an aggrieved individual protected by this Act." 5 M.R.S.A. § 4613(2)(B)(8)(c). The plaintiff must prove malice or reckless indifference by "clear and convincing evidence." *Batchelder v. Realty Resources Hospitality, LLC*, 914 A.2d 1116, 1124.

Spectrum contends that Dr. Madigan cannot prove with clear and convincing evidence that Spectrum acted with malice or reckless indifference to his rights. *See Spectrum's Mot.* at 18–19. Spectrum also urges the affirmative defense of good faith, relying heavily on the Supreme Court's opinion in *Kolstad v. American Dental Ass'n*, 527 U.S. 526 (1999). *See Spectrum's Mot.* at 19–20.

Whether Spectrum acted with malice or reckless indifference to Dr. Madigan's rights is a question of fact. Spectrum may, at trial, rebut Dr. Madigan's evidence with evidence that it acted in good faith. But, viewing the evidence in the light most favorable to Dr. Madigan, the Court cannot conclude at this stage that Spectrum did not act with malice or reckless indifference.

### ii.      Cap on Punitive Damages

The sum of compensatory and punitive damages awarded under the MHRA may not exceed $50,000 if the defendant has more than 14 and fewer than 101 employees; the sum may not exceed $100,000 if the defendant has more than 100 and fewer than 201 employees. 5 M.R.S.A. § 4613(2)(B)(8)(e)(i)–(ii).

Spectrum contends that its 102 shareholder physicians are proprietors rather than employees for purposes of the MHRA. *See Spectrum's Mot.* at 15. In deciding whether to count four shareholder physicians as "employees" under the Americans with Disabilities Act of 1990 (ADA), the Supreme Court looked to six factors:

Whether the organization can hire or fire the individual or set the rules and regulations of the individual's work

Whether and, if so, to what extent the organization supervises the individual's work

> Whether the individual reports to someone higher in the organization
>
> Whether and, if so, to what extent the individual is able to influence the organization
>
> Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts
>
> Whether the individual shares in the profits, losses, and liabilities of the organization.

*Clackamas Gastroenterology Associates, P.C. v. Wells*, 538 U.S. 440, 449–50 (2003). The Court added that "the answer to whether a shareholder-director is an employee depends on all of the incidents of the relationship . . . with no one factor being decisive." *Id.* at 451.

Dr. Madigan appears to concede that members of Spectrum's Advisory Committees and Board would fall outside *Clackamas*'s definition of employee, *see Pl.'s Opp'n 1* at 15. The record does not reveal how many shareholder physicians serve on Spectrum's Advisory Committees and Board. During 2009, Spectrum had a total of 77 employees and 103 shareholder physicians, meaning that 24 of its shareholder physicians would have to be counted as employees to subject it to the higher damages cap. During 2010, Spectrum had a total of 71 employees and 102 shareholder physicians, meaning that 30 of its shareholder physicians would have to be counted as employees to subject it to the higher damages cap.

The Court declines to make a final determination as to the exact number of Spectrum employees for purposes of determining the amount of the statutory cap under Maine law. First, Dr. Madigan has not yet obtained a damages award that

would make this Court's ruling necessary and the Court declines to issue an advisory ruling.  Second, the parties have provided information about some, but not all of the six *Clackamas* factors.  There is no evidence as to the extent to which Spectrum "supervises the individual's work," whether shareholder physicians "report[ ] to someone higher in the organization," and whether Spectrum enters into written agreements or contracts with shareholder physicians that confirm the parties' intent to treat shareholder physicians as employees.  *Clackamas*, 538 U.S. at 449–50.  There is some evidence as to the extent to which an individual shareholder physician "is able to influence the organization," but the evidence is indirect, such as the right to participate in shareholder meetings.  *Id.* at 450.  The record reveals that the shareholder physicians' compensation is "directly tied to the profits or losses of Spectrum," DSMF1 ¶ 34; PRDSMF1 ¶ 34, but there is no specific information about the extent to which shareholder physicians "share[ ] in the profits, losses, and liabilities of the organization."  *Clackamas*, 538 U.S. at 450.  Moreover, in *Clackamas*, the Supreme Court observed that the answer to this question "cannot be decided in every case by a shorthand formula or magic phrase," *id.* at 450 n.10 (internal punctuation omitted), and after observing that there were some facts in the record that weighed in favor and some against employee status, rather than rule on the issue as a matter of law, the Supreme Court remanded the matter for further proceedings.  *Id.* at 451.

Given the spotty state of the record, the Court cannot rule that Spectrum's shareholder physicians are or are not employees within the meaning of 5 M.R.S.A. § 4613.  In any event, the Court will answer this question only if the case requires it.

### C.    Count II:  Tortious Interference

Dr. Madigan claims in Count II that SMMC tortiously interfered with his prospective contractual advantage with Spectrum.   Under Maine common law, tortious interference with a prospective economic advantage requires a plaintiff to prove: "(1) that a valid . . . prospective economic advantage existed; (2) that the defendant interfered with that . . . advantage through fraud or intimidation; and (3) that such interference proximately caused damages." *Currie v. Industrial Security, Inc.*, 915 A.2d 400, 408 (Me. 2007).  SMMC moves for summary judgment on Count II, contending that Dr. Madigan cannot prove either fraud or intimidation.  *SMMC's Mot.* at 2.  The other elements of the tort are not in dispute.

### 1.    Fraud

Under Maine common law, the elements of interference by fraud are:

> (1) making a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or refrain from acting in reliance on it, and (5) the other person justifiably relies on the representation as true and acts upon it to the damage of the plaintiff.

*Rutland v. Mullen*, 798 A.2d 1104, 1111 (Me. 2002).

Dr. Madigan supports his claim with "a series of false statements made by SMMC's representatives."  *Pl.'s Opp'n 2* at 4.  First is Dr. Lavoie's alleged remark to Mr. Landry that Dr. Madigan "was a managing partner of SMI and that he was difficult to work with and had provided no direction for his group."   *Id.* (citing

PSAMF2 ¶ 30).  Second is a remark allegedly made by an SMMC representative at a February 5, 2010, meeting with Mr. Landry that Dr. Madigan was "difficult to work with, uncooperative, inflexible, and argumentative."  *Pl.'s Opp'n 2* at 5 (citing PSAMF2 ¶ 33).  Third is a remark allegedly made by an SMMC representative at the same February 5, 2010, meeting that, "because Dr. Madigan failed to provide leadership to his group and the Radiology Department he was viewed as the primary reason for SMMC's dissatisfaction with SMI and the resulting change in service."  *Pl.'s Opp'n 2* at 5 (citing PSAMF2 ¶ 33).  According to Dr. Madigan, the falsity of these statements is established by Dr. Merriam's contrary testimony.  *See Pl.'s Opp'n 2* at 4–5.

Though SMMC disputes both that Dr. Lavoie made these statements and that they were false, SMMC's primary defense is that Spectrum did not rely on these representations in making its decision not to employ Dr. Madigan to work at SMMC, and that "[w]ithout reliance, there is no fraud."  *SMMC's Reply* at 4.  According to SMMC, Spectrum relied only upon SMMC's representation that it was "not comfortable having Dr. Madigan work at SMMC as his primary place of radiology practice, although the hospital would have no objection to him being hired by Spectrum and working at another location."  *SMMC's Mot.* at 7 (citing DSMF2 ¶¶ 11, 25, 26); *see also SMMC's Reply* at 5 (citing DSMF2 ¶¶ 11, 24).  SMMC further contends that Spectrum did not consider Dr. Madigan for positions in North Conway and Bangor because "Dr. Madigan gave Mr. Cutler the impression that he

was interested only in positions located in the Greater Portland area, preferably at SMMC." *SMMC's Reply* at 7 (citing DSMF2 ¶ 28).

A reasonable juror could conclude, based on evidence in the record, that an SMMC representative told Mr. Landry that Dr. Madigan was "difficult to work with, uncooperative, inflexible, and argumentative." *See* PSAMF2 ¶ 33. A reasonable juror could further conclude that Spectrum relied on this representation in deciding whether to employ Dr. Madigan. *See* PSAMF2 ¶ 35 ("Because of these reports from SMMC it was unlikely that Spectrum would add [Dr. Madigan] to the practice or look to add him to the practice"). These genuine issues of material fact lead the Court to deny summary judgment on Count II.

### 2.   Intimidation

The Maine Law Court last discussed tortious interference by intimidation in *Currie*:

> [I]ntimidation is not restricted to frightening a person for coercive purposes, but rather exists wherever a defendant has procured a breach of contract by making it clear to the party with which the plaintiff had contracted that the only manner in which that party could avail itself of a particular benefit of working with defendant would be to breach its contract with plaintiff.

915 A.2d at 408 (citing *Pombriant v. Blue Cross/Blue Shield of Maine*, 562 A.2d 656, 659 (Me. 1989)) (internal punctuation omitted).

As the facts in *Currie* were somewhat similar to those here, they are worth summarizing. Herschel Currie was employed as a security guard by a company called Industrial Security, Inc. (ISI), and placed at a lumber mill called Irving Forest Products, Inc. (IFPI). *Currie*, 915 A.2d at 402. While employed by ISI, Mr.

Currie complained repeatedly about Alain Ouellette's speedy driving through the mill yard.  *Id.*  Mr. Ouellette was a regional manager at another facility for which ISI provided security.  *Id.*  Mr. Ouellette continually urged Mr. Currie's supervisor, Mr. Johnson, to fire him, but Mr. Johnson at first resisted because he believed Mr. Currie was doing a good job.  *Id.* at 403.  A few months after their first meeting, Mr. Johnson again met with Mr. Ouellette and fired Mr. Currie later that day.  *Id.*  Mr. Johnson told Mr. Currie that he did not want to fire him, but refused to tell him the reason for the firing; Mr. Johnson admitted that he would not have fired Mr. Currie without Mr. Ouellette's urging.  *Id.*

The Law Court held that these facts supported a reasonable inference of tortious interference by intimidation.  *Id.* at 408.  The *Currie* Court reasoned that Mr. Johnson was "acutely aware" of the authority Mr. Ouellette had to terminate ISI's contract with IFPI, and that a jury could infer the existence of a tacit ultimatum: fire Mr. Currie or lose the contract.  According to the *Currie* court, such an arrangement "need not be overtly expressed to be 'made clear' to Johnson."  *Id.*

In *Pombriant*, a 1989 case, the plaintiff, Paul Pombriant, was the insurance broker of record for Bennett Industries.  562 A.2d at 656.  A firm named Johnson had been Bennett's broker of record before Mr. Pombriant.  *Id.*  When Blue Cross initiated a new program, there was some confusion over whether Mr. Pombriant or Johnson was Bennett's broker of record, and Bennett's insurance coverage was placed through Johnson despite Mr. Pombriant's protests.  *See id.* at 657–58.  The *Pombriant* Court held that the verdict against Blue Cross for tortious interference

45

was supportable due to Blue Cross's "intimidating means of making it clear to Bennett that the only manner in which it could avail itself of Blue Cross's lower rates for the desired insurance would be by using the brokerage services of Johnson."[49]  *Id.* at 659.

Here, Dr. Madigan argues that the evidence in the record supports an inference that SMMC's award of the contract to Spectrum was conditioned on Spectrum's not hiring Dr. Madigan to work at SMMC.  *Pl.'s Opp'n 2* at 7.  Dr. Madigan contends that such an implicit "quid pro quo" constitutes intimidation under *Currie*.  *Id.*

SMMC replies that the evidence "would not permit a reasonable jury to infer that Spectrum feared it would not receive the contract unless it refused to hire Dr. Madigan"; that SMMC awarded Spectrum the contract in February of 2010, before Spectrum made any decisions about whether to employ any of the SMIA radiologists; that SMMC did not condition its award of the contract to Spectrum on any decision by Spectrum concerning the radiologists; and that SMMC made clear to Spectrum that it had no objection to Spectrum's hiring Dr. Madigan so long as he was not placed at SMMC. *SMMC's Reply* at 13–14.

The Court concludes that the evidence would warrant a reasonable juror in believing that SMMC implicitly conditioned its award of the contract to Spectrum on Spectrum's not hiring Dr. Madigan to work at SMMC.  During a November 2, 2009, phone conversation, Dr. Lavoie allegedly told Mr. Landry that if Spectrum

---

[49]     Then-Justice Hornby dissented, noting that "[t]his is not intimidation in any ordinary sense of the word; it is simply the imposition of an exclusive dealing arrangement or a refusal to deal through a particular agent."  562 A.2d at 662.

were to win the contract, Dr. Lavoie "would be open to Spectrum's retaining [Drs. Weltin, Merriam, and Tupper] and putting in new leadership of the department." PSAMF1 ¶ 40; DRPSAMF1 ¶ 40; PSAMF2 ¶ 32; DRPSAMF2 ¶ 32.  When SMMC informed Spectrum, on February 5, 2010, that Spectrum had won the contract, SMMC's representatives made it clear that Dr. Madigan was the "primary reason" for the change in service, and implied that Spectrum should not consider Dr. Madigan for a position at SMMC.  PSAMF1 ¶ 41; DRPSAMF1 ¶ 41; PSAMF2 ¶ 33; DRPSAMF2 ¶ 33; DSMF1 ¶ 10; PRDSMF1 ¶ 10.  Although Mr. Cutler conducted an initial interview with Dr. Madigan, a reasonable juror could conclude that the interview was a sham, and that Spectrum never considered hiring Dr. Madigan to work at SMMC.  SMMC's argument that it did not object to Spectrum's hiring Dr. Madigan for another location only limits the scope of its alleged interference with Dr. Madigan's prospective economic advantage; it does not absolve SMMC from liability.

Under *Currie* and *Pombriant*, a finding that SMMC's award of the contract to Spectrum was conditioned on Spectrum's not hiring Dr. Madigan to work at SMMC would amount to "intimidation."  Therefore, there is a genuine issue of material fact as to whether SMMC's award of the contract did include such an implicit condition.

## IV.    CONCLUSION

The Court DENIES Spectrum's Motion for Summary Judgment (ECF No. 39).[50]  The Court DENIES SMMC's Motion for Summary Judgment on Plaintiff's Tortious Interference Claim (ECF No. 37).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE


Dated this 28th day of September, 2012

---

[50]    In its reply to the Plaintiff's Statement of Additional Material Facts, Spectrum interposed several evidentiary objections and, in accordance with Local Rule 56(e), Dr. Madigan responded. *Pl.'s Local Rule 56(e) Resp. to Def. Spectrum Medical Grp., P.A.'s ("Spectrum's") Evid. Objections* (ECF No. 83).  The Court has addressed the objections in footnotes 3, 24, 31, 36, and 41.